# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF GEORGIA

## ATLANTA DIVISION

| | |
|---|---|
| *In re MiMedx Group, Inc. Securities Litigation* | **Civil Action No 1:13-cv-03074-TWT**<br><br>**PLAINTIFF'S MOTION FOR CLASS CERTIFICATION AND APPOINTMENT OF CLASS REPRESENTATIVE AND CLASS COUNSEL** |

# TABLE OF CONTENTS

I.   FACTS .................................................................................................................. 2

II.  STANDARD ......................................................................................................... 2

III. ARGUMENT ........................................................................................................ 3

    A.   The Proposed Class Action Satisfies Rule 23(a) ...................................... 3

        a.   The Members Of The Class Are So Numerous That Joinder Of All Members Is Impractical ("Numerosity") ..................................... 4

        b.   There Are Many Questions Of Law Or Fact Common To The Members Of The Class ("Commonality") ...................................................... 5

        c.   Plaintiff's Claims Are Typical Of The Claims Of The Class ("Typicality") ...................................................................................... 6

        d.   Plaintiff Will Fairly And Adequately Protect The Interests Of The Class ("Adequacy") ............................................................................ 7

    B.   The Proposed Class Satisfies Rule 23(b)(3) ............................................. 8

        a.   Common Questions of Law and Fact Predominate over Individual Questions .............................................................................................. 8

    C.   There Is A Presumption of Reliance Where The Defendants Commit A Fraud-On-The-Market ..................................................................................... 9

        1.   A plaintiff can show fraud-on-the-market either by showing that the security trades on an efficient market or by showing the misrepresentation had a price impact ........................................... 14

        a.   The *Cammer* Factors .............................................................. 17

        b.   The *Krogman* Factors ............................................................ 21

        c.   Price Impact ........................................................................... 22

    D.   A Class Action Is Superior to Other Available Methods for Resolving This Controversy ............................................................................................... 23

    E.   The Court Should Appoint Lead Counsel as Class Counsel ................... 24

    F.   CONCLUSION ...................................................................................... 25

i

# TABLE OF AUTHORITIES

**Cases**

*Amchem Products, Inc. v. Windsor,*
521 U.S. 591 (1997) ........................................................................................... 9

*Amgen Inc. v. Connecticut Ret. Plans & Trust Funds,*
133 S. Ct. 1184 (2013) ................................................................................ 3, 14

*Appleyard v. Wallace,*
754 F.2d 955 (11th Cir. 1985) ........................................................................ 6

*Arnaz v. Catalyst Pharm.,*
302, F.R.D. 657 (S.D. Fla. 2014) ................................................................... 17

*Basic Inc. v. Levinson,*
485 U.S. 224 (1988) ................................................................................ 10, 12

*Bensley v. FalconStor Software, Inc.,*
277 F.R.D. 231 (E.D.N.Y. 2011) .................................................................. 24

*Blackie v. Barrack,*
524 F.2d 891 (9th Cir. 1975) ........................................................................... 2

*Cammer v. Bloom,*
711 F. Supp. 1264 (D.N.J. 1989) .................................................................. 13

*Cox v. American Cast Iron Pipe Co.,*
784 F.2d 1546 (11th Cir. 1986) ...................................................................... 5

*Erica P. John Fund, Inc. v. Halliburton Co.,*
131 S. Ct. 2179, 180 L. Ed. 2d 24 (2011) ............................................ 10, 14, 15

*FindWhat Investor Grp. v. FindWhat.com,*
658 F.3d 1282 (11th Cir. 2011) .................................................................... 16

*Gomes v. Illinois State Bd.,*
117 F.R.D. 394 (N.D. Ill. 1987) ................................................................... 25

*Griffin v. Carlin,*
755 F.2d 1516 (11th Cir. 1985) ...................................................................... 7

*Halliburton Co. v. Erica P. John Fund, Inc.,*
134 S.Ct. 2398 (2014) ......................................................................... passim

*In re Alexander Grant & Co. Litig.,*
110 F.R.D. 528 (S.D. Fla. 1986) ..................................................................... 9

*In re AmeriFirst Sec. Litig.,*
139 F.R.D. 423 (S.D. Fl. 1991) ....................................................................... 6

*In re Fuwei Films Sec. Litig.,*
247 F.R.D. 432 (S.D.N.Y. 2008) .................................................................. 24

ii

*In re IGI Sec. Litig.*,
    122 F.R.D. 451 (D.N.J. 1988) ................................................................................. 6

*In re Miller Indus.*, *Sec. Litig.*,
    186 F.R.D. 680 (N.D.G.A 1999) ............................................................................ 24

*In re Netbank Inc., Sec. Litig.*,
    256 F.R.D. 656 (N.D.G.A. 2009) ....................................................................... 4, 5

*In re Scientific–Atlanta, Inc. Sec. Litig.*,
    571 F.Supp.2d 1315 (N.D.G.A. 2007) .................................................................... 5

*In re Theragenics Corp. Sec. Litig.*,
    205 F.R.D. 687 (N.D.G.A. 2002, Thrash, J.) .............................................. 3, 4, 24

*Kennedy v. Tallant*
    710 F.2d 711 (11th Cir. 1983) ............................................................................... 6

*Kirkpatrick v. J.C. Bradford & Co.*,
    827 F.2d 718 (11th Cir.1987) ................................................................. 3, 7, 9, 24

*Kornberg v. Carnival Cruise Lines, Inc*.,
    741 F.2d 1332 (11th Cir. 1984) ............................................................................. 6

*Krogman v. Sterritt*,
    202 F.R.D. 467 (N.D. Tex. 2001) ................................................................. 10, 14

*Levine v. SkyMall, Inc.*,
    CIV. 99-166-PHX-ROS, 2002 WL 31056919 (D. Ariz. May 24, 2002) ................. 11

*Local 703, I.B. of T. Grocery & Food Employees Welfare Fund v. Regions Fin. Corp.*,
    282 F.R.D. 607 (N.D. Ala. 2012) ................................................... 7, 11, 16, 17

*Lutz v. Int'l Ass'n of Machinists and Aerospace Workers*,
    196 F.R.D. 447 (E.D. Va. 2000) .......................................................................... 25

*Robinson Humphrey/American Express v. Sanders*,
    485 U.S. 959, 108 S.Ct. 1220, 99 L.Ed.2d 421 (1988) ......................................... 3

*Rosario-Guerrro v. Orange Blossom Harvesting*,
    265 F.R.D. 619 (M.D. Fla. 2010) .......................................................................... 6

*Skeway v. China Natural Gas, Inc.*,
    CV 10-728-RGA, 2014 WL 2795466 (D. Del. June 18, 2014) ............................. 24

*Vinh Nguyen v. Radient Pharm. Corp.*,
    SACV 11-00406 DOC, 2014 WL 1802293
    (C.D. Cal. May 6, 2014) ....................................................................................... 24

*Walco Investments, Inc. v. Thenen*,
    168 F.R.D. 315 (S.D. Fl. 1996) .............................................................................. 4

*Wells v. HBO & Co.*,
    1991 WL 131177 (N.D.G.A. Apr. 24, 1991) ......................................................... 2

*Zeidman v. J. Ray McDermott & Co.*,
    651 F.2d 1030 (5th Cir. 1981) ............................................................................... 4

iii

**Other Authorities**

7A Charles A. Wright, Arthur R. Miller and Mary K. Kane, *Federal Practice and Procedure*: Civil § 1762 at 159 (1986) ................................................................................................................. 4

The Securities Class Action Services Top 50 for 2013, published July 16, 2014, at page 5, available at: http://www.issgovernance.com/file/publications/iss-securities-class-action-services-top-50-for-2013.pdf.................................................................................................... 7

**Rules**

Fed. R. Civ. P. 23 ................................................................................................... passim

iv

Plaintiff Arnold Entz ("Plaintiff")[1], by and through his undersigned counsel, hereby moves the Court for an entry of an Order certifying this securities litigation as a class action.  Plaintiff seeks class certification on behalf of all persons or entities that purchased or otherwise acquired MiMedx Group, Inc. ("MiMedx" or the "Company") securities during the period from March 15, 2013 through September 4, 2013, inclusive (the "Class Period") and did not sell such shares prior to September 4, 2013.  In addition, Plaintiff requests that the Court appoint him as class representative and appoint The Rosen Law Firm, P.A. as Class Counsel, and the Antonino Firm, LLC as Liaison Class Counsel.

This case arises from Defendants' MiMedx, and its CEO Pete Petit's, CFO Michael Senken's, and COO William Taylor's (collectively, "Defendants") violations of Sections 10(b) and 20(a) of the Securities Exchange Act of 1934  (the "Exchange Act").

Plaintiff seeks class certification that will permit the efficient and effective prosecution of this action.  Securities cases, such as this action, are ideally suited for class treatment because of the predominance of common issues of fact and the impracticability of bringing individual actions to address a common wrong. This Court has held that "Rule 23 is to be construed liberally to permit class actions, especially in securities fraud cases, where the class action device may serve to deter

---

[1] Tim Kelly, who was appointed lead plaintiff, has decided not to move to be appointed as a class representative.

1

illegal activity." *Wells v. HBO & Co.*, 1991 WL 131177 at *1 (N.D. Ga. Apr. 24, 1991) (citing *Blackie v. Barrack*, 524 F.2d 891, 903 (9th Cir. 1975), *cert denied*, 429 U.S. 816 (1976)).

## I.    FACTS

MiMedx develops and markets products made from human amniotic tissue that it claims help the healing process. Two of its injectable products, AmnioFix and EpiFix are at issue in this case. MiMedx was able to generate significant revenue by marketing these products without FDA approval based upon a purported exemption under Section 361 of the Public Health Services Act ("361 HCT/P's"). ¶3.[2.] MiMedx continued to manufacture and market these products as 361 HCT/P's even after an on-site inspection by the FDA informed Defendants that the FDA was scrutinizing whether in fact these products were indeed 361 HCT/P's.

On August 28, 2013, the FDA sent MiMedx an "Untitled Letter," stating that AmnioFix and EpiFix did not meet the requirements for Section 361 exemption. When the letter was publicized on September 4, 2014, MiMedx's stock fell 36%, from $6.06 per share to $3.85 per share on extraordinary volume, damaging investors. ¶6.

## II.    STANDARD

---

[2] Citations to "¶___" are to paragraphs of the Second Consolidated Amended Class Action Complaint, Dkt. #67. Citations to "Rosen Dec. Ex. ___" are to exhibits to the Declaration of Laurence Rosen, filed herewith. Citations to "Seguin Dec. ¶ __" are to paragraphs of the Expert Report of Paul J. Seguin, Ph.D., attached as Exhibit 1 to the Declaration of Laurence Rosen.

To obtain certification of a class action for money damages under Rule 23(b)(3), a plaintiff must satisfy Rule 23(a)'s prerequisites of [1] numerosity, [2] commonality, [3] typicality, and [4] adequacy of representation, and [5] must also establish that "the questions of law or fact common to class members predominate over any questions affecting only individual members," and [6] that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." *Amgen Inc. v. Connecticut Ret. Plans & Trust Funds*, 133 S. Ct. 1184, 1191 (2013). As Your Honor observed: "The Eleventh Circuit has explicitly recognized that securities class actions serve both the public interest in maintaining the integrity of the securities markets and the private interests of investors who would not otherwise obtain redress of grievances through a multiplicity of small individual damage suits." *In re Theragenics Corp. Sec. Litig.*, 205 F.R.D. 687, 693-94 (N.D.G.A. 2002, Thrash, J.)[3]

## III.   ARGUMENT

### A. The Proposed Class Action Satisfies Rule 23(a)

The four prerequisites of Fed. R. Civ. P. 23(a) are that: (1) the class is so numerous that joinder of all members is impracticable; (2) there be questions of law or fact common to the class; (3) the claims or defenses of the representative parties be typical of the claims or defenses of the class; and (4) the representative parties

---

[3]citing *Kirkpatrick v. J.C. Bradford & Co.,* 827 F.2d 718, 727 (11th Cir.1987), *cert. denied sub nom, Robinson Humphrey/American Express v. Sanders,* 485 U.S. 959, 108 S.Ct. 1220, 99 L.Ed.2d 421 (1988).

will fairly and adequately protect the interests of the class.  This case satisfies each of these requirements.

### a. The Members Of The Class Are So Numerous That Joinder Of All Members Is Impractical ("Numerosity")

For class certification to be appropriate, the proposed class must be so numerous that "joinder of all members is impracticable." Rule 23(a)(1). "'Impracticable is not synonymous with 'impossible.'"  *Theragenics,* 205 F.R.D. 687, 693. Rather, the class representative need only show that it is difficult or inconvenient to join all the members of the class.  *Walco,* 168 F.R.D. at 324 (citing 7A Charles A. Wright, Arthur R. Miller and Mary K. Kane, *Federal Practice and Procedure*: Civil § 1762 at 159 (1986)). Moreover, the numerosity requirement of Rule 23(a)(1) is generally assumed to have been met in class action suits involving nationally traded securities. *Theragenics* at 693; *Zeidman v. J. Ray McDermott & Co.*, 651 F.2d 1030, 1038 (5th Cir. 1981); *In re Netbank Inc., Sec. Litig.*, 256 F.R.D. 656, (N.D.G.A. 2009) (Martin, J.)).  Here, the Class is so numerous that joinder of all members is impracticable. Plaintiff has submitted evidence showing that during the Class Period, on average 613,000 shares of MiMedx stock were traded ***per day*** (Seguin Dec. ¶37), that at least 14 major institutions owned MiMedx common stock during the Class Period (*Id.* ¶98), and that at least 21 broker-dealers made a market in MiMedx common stock. (*Id.* ¶46). Plaintiff has alleged that there are hundreds or thousands of members of the potential class (Complaint ¶93), and that the members

4

of the proposed class are so numerous that joinder is impracticable. (*Id.*) Thus, the proposed class easily meets numerosity.

### b. There Are Many Questions Of Law Or Fact Common To The Members Of The Class ("Commonality")

In order to maintain a class action, there must be "questions of law or fact common to the class." Fed. R. Civ. P. 23(a)(2). Commonality is met if the plaintiff demonstrates that "'a sufficient nexus exists between the legal claims of the named class representatives and those of individual class members' or demonstrates that his ''claims share the same essential characteristics as the claims of the class at large.'" *In re Netbank Inc. Sec. Litig.*, 259 F.R.D. 656, 664, quoting *In re Scientific–Atlanta, Inc. Sec. Litig.,* 571 F.Supp.2d 1315, 1325 (N.D.G.A.2007) (Story, J.) Rule 23 thus does not require a complete identity of circumstances among class members; differences among class members are not fatal to a class action as long as some common questions of fact or law exist. *Cox v. American Cast Iron Pipe Co.*, 784 F.2d 1546, 1557 (11th Cir. 1986). Virtually all of the questions of law and fact in this action are common to Plaintiff and all other purchasers of MiMedx securities during the Class Period. These common questions of law and fact include*, among others*:

- Whether the provisions of the Exchange Act were violated by Defendants' acts as alleged in the Complaint;

- Whether documents, including press releases and public statements issued by Defendants to the investing public misrepresented material facts about the Company and its business; and

- The extent to which members of the class have sustained damages, and the proper measure of damages.

Accordingly the commonality requirement is satisfied.

### c.  Plaintiff's Claims Are Typical Of The Claims Of The Class ("Typicality")

Rule 23(a)(3) requires that "the claims…of the representative parties [be] typical to the claims…of the class."  The typicality requirement is met when the class representative's claims have the same essential characteristics and are based on the same legal theory as claims of the other members of the class. *Appleyard v. Wallace*, 754 F.2d 955, 958 (11th Cir. 1985); *Kornberg v. Carnival Cruise Lines, Inc.*, 741 F.2d 1332, 1337 (11th Cir. 1984).  Factual differences between the claims of the class representative and those of other class members will not defeat typicality. *Appleyard*, 754 F.2d at 958; Rather, "the typicality requirement is generally met if the class representative and the class members received the same unlawful conduct, irrespective of whether the fact patterns that underlie each claim vary." *Rosario-Guerrro v. Orange Blossom Harvesting*, 265 F.R.D. 619, 627 (M.D. Fla. 2010)[4]. Here, Plaintiff's claims are typical of others in the Class because each: (1) purchased MiMedx shares at artificially inflated prices during the Class Period

---

[4] The focus of the typicality inquiry is not the plaintiff's behavior, but the defendants' actions.  *In re IGI Sec. Litig.*, 122 F.R.D. 451, 456 (D.N.J. 1988) ("[I]t is defendants' course of conduct . . . upon which the court must focus in determining typicality"). "As long as Plaintiffs assert, as they do here, that Defendants committed the same wrongful acts in the same manner against all members of the class, they establish the necessary typicality." *AmeriFirst*, 139 F.R.D. at 429 (citing *Kennedy v. Tallant* 710 F.2d 711, 717 (11th Cir. 1983)).

6

and (2) seek to recover damages for losses incurred when the fraud was revealed. Plaintiff's claims and the Class' claims arise out of the same wrongful conduct and are premised on the same legal theory, satisfying the typicality requirement.

### d. Plaintiff Will Fairly And Adequately Protect The Interests Of The Class ("Adequacy")

The adequacy requirement of Rule 23(a)(4) is met if it appears that (1) plaintiff's interests are not antagonistic to those of other members of the class that he seeks to represent, and (2) the plaintiffs' attorneys are qualified, experienced and generally able to conduct the litigation. *Kirkpatrick*, 827 F.2d at 726; *Griffin v. Carlin*, 755 F.2d 1516, 1533 (11th Cir. 1985).[5] First, Plaintiff has engaged qualified, experienced and capable attorneys for this type of litigation. Proposed Class Counsel, The Rosen Law Firm, P.A. is experienced in complex securities fraud class actions and has successfully litigated over forty securities class actions as lead counsel. See Firm Resume, Rosen Dec., Ex. 2. Proposed Class Counsel has the ability and willingness to prosecute this action vigorously. In addition, the Rosen Law Firm was ranked the number 4 law firm in the number of class action settlements achieved in 2013 in the "Securities Class Action Services Top 50." [6]

---

[5] "[C]lass representatives may rely on their chosen counsel to litigate the case without such reliance making them inadequate." *Local 703, I.B. of T. Grocery & Food Employees Welfare Fund v. Regions Fin. Corp.*, 282 F.R.D. 607, 617 (N.D. Ala. 2012).

[6] *See* "The Securities Class Action Services Top 50 for 2013, published July 16, 2014, at page 5, available at: http://www.issgovernance.com/file/publications/iss-securities-class-action-services-top-50-for-2013.pdf.

Second, Plaintiff is well suited to represent the Class.  Plaintiff's interests are the same as those of the absent Class members, and there are no conflicts between Plaintiff and the Class.  Plaintiff has been actively involved in this litigation and is willing to serve as a representative party on behalf of the class and is aware of his fiduciary duties to absent class members as class representative. *See* Declaration of Arnold Entz attached as Exhibit 3 to the Rosen Declaration. Plaintiff has actively monitored this action, and is willing and able to prosecute this action on behalf of the Class to a successful conclusion. *Id.* The interests of the proposed class representative and those of the class are aligned. Plaintiff and all class members have suffered losses in their purchases of MiMedx securities. It is in the Plaintiff's interest to prosecute vigorously this action on behalf of the Class.  Thus, Plaintiff "will fairly and adequately protect the interests of the class." *See* Fed. R. Civ. P. 23(a)(4).

## B. The Proposed Class Satisfies Rule 23(b)(3)

Rule 23(b)(3) requires that the "questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." Plaintiff has met both requirements.

### a. Common Questions of Law and Fact Predominate over Individual Questions

Where, as here, Plaintiff's claims involve allegations that the Defendants committed the same unlawful acts in the same method against the entire Class, common claims are found to predominate.  *Kirkpatrick v. J.C. Bradford & Co.*, 827

8

F.2d 718, 724 (11th Cir. 1987). The Supreme Court has recognized that "[p]redominance is a test readily met in certain cases alleging…securities fraud…" *Amchem Products, Inc. v. Windsor*, 521 U.S. 591 (1997). As discussed above, the predominance of common questions over individual claims is apparent because if Plaintiff and every other Class member were each to bring an individual action, they would each still be required to prove Defendants' liability and would need to prove the same allegations. "Courts generally focus on the liability issue in deciding whether the predominance requirement is met, and if the liability issue is common to the class, common questions are held to predominate over individual questions." *In re Alexander Grant & Co. Litig.*, 110 F.R.D. 528, 534 (S.D. Fla. 1986).

Undoubtedly common questions of fact and law predominate here because Defendants' alleged conduct affected all class members in the same manner – first by misrepresenting that their products were minimally manipulated and enjoyed Section 361 exemption from FDA regulation and second by failing to disclose that the FDA was scrutinizing MiMedx's manufacture and marketing of those products as Section 361 HCT/P's.

### C. There Is A Presumption of Reliance Where The Defendants Commit A Fraud-On-The-Market

Reliance is an element of a claim under Section 10(b). Plaintiffs who have bought stock on the open market and seek to bring a class action under Section 10(b) on behalf of themselves and other open-market purchasers typically rely on the fraud-on-the-market presumption of reliance. The efficient market presumption of

9

reliance was first recognized by the Supreme Court in *Basic Inc. v. Levinson*, 485 U.S. 224, 231 (1988). The fundamental premise of *Basic* is that in well-developed securities markets a misrepresentation of material fact is incorporated in the price of a stock. *Halliburton Co. v. Erica P. John Fund, Inc.*, 134 S.Ct. 2398, 2416 (2014) (*citing Erica P. John Fund, Inc. v. Halliburton Co.*, 131 S. Ct. 2179, 2186, 180 L. Ed. 2d 24 (2011) ("*Halliburton I*"). If the company's stock trades in an efficient market, courts presume that the specific false statements were incorporated into the company's stock price, creating a presumption of reliance *on those statements. See generally Krogman v. Sterritt*, 202 F.R.D. 467, 470 (N.D. Tex. 2001).

The Supreme Court in *Halliburton Co. v. Erica P. John Fund, Inc.*, 134 S.Ct. 2398 (2014) ("*Halliburton II*") reaffirmed the efficient market presumption of reliance first recognized by *Basic*. *Halliburton II* clarified *Basic* by pointing out that the prerequisites to the presumption: (i) proof that the misrepresentation was material, (ii) was issued publicly, and (iii) the security traded in an efficient market, were merely proxies for the ultimate fact undergirding it: that the market price of the security was affected by the misrepresentation (i.e. "price impact"). *Halliburton II* gave defendants an opportunity to rebut the presumption of reliance by showing that neither the false statements complained of, nor the revelation that they were false affected the company's stock price– i.e., there was no "price impact." But *Halliburton II* also clarified that the efficient market assumption that

10

underlies the presumption of reliance is "modest" and that a plaintiff can show market efficiency *either* by providing evidence that the company's stock generally traded on an efficient market, *or* by evidence that the misleading statement had a price impact. *Halliburton II*, 134 S. Ct. at 2414-15.

Most securities class actions brought on behalf of open-market purchasers are brought under Section 10(b) of the Securities and Exchange Act of 1934 (the "Exchange Act"). Reliance on a false statement is an element of a claim under Section 10(b). *Halliburton II*, 134 S. Ct. at 2407. In well-developed securities markets (dubbed "efficient markets") prices react quickly to important new information as it is released. *Id.* at 2409. The paradigmatic example of an efficient market is the market for the stock of a public company trading on a major exchange like the NASDAQ. *Levine v. SkyMall, Inc.*, CIV. 99-166-PHX-ROS, 2002 WL 31056919, at *5 (D. Ariz. May 24, 2002) ("There should be a presumption that certain markets are developed and efficient for virtually all the securities traded ... [on] the NASDAQ National Market System.")

In *Basic*, the Court gave several reasons to recognize the fraud-on-the-market theory, which provides that a plaintiff is entitled to a presumption of reliance by showing that the security plaintiff bought traded on an efficient market. *Basic Inc.*, 485 U.S. at 248. First, the Court was concerned that without the theory, it would be impossible for any action to proceed as a class. *Id.* at 242; *Halliburton II*, 134 S. Ct. at 2408 (recognizing that preserving investors' ability to recover

11

through class actions was important to *Basic*).  Second, the traditional concept of actual reliance on a specific statement was an unrealistic model of modern secondary securities markets. *Basic*, 485 U.S. at 244-45 (internal quotations omitted). In such markets, buyers buy ***from the market***, rather than from individual sellers, and sellers sell into it; the market itself processes the information, transmitting it to investors as the security's price. *Id.* Third, investors rely on the market price, because they rely on the assumption that information incorporated into it was true. Thus, the Court ruled, "[b]ecause most public available information is reflected in market price, an investor's reliance on any public material misrepresentations, therefore, may be presumed for purposes of a Rule 10b-5 action." *Basic*, 485 U.S. at 247.

*Basic* left unsettled how to prove that the false information ***was*** incorporated into the stock price, entitling them to the fraud-on-the-market presumption of reliance.  A district court, in a decision which would become the leading case on the subject, did so. *Cammer v. Bloom*, 711 F. Supp. 1264, 1276 (D.N.J. 1989).

Under *Cammer* plaintiffs show entitlement to the presumption of reliance by proving that the *security* trades on an efficient market. The five *Cammer* factors are all proxies for whether, in general, information is incorporated into the security's price: (1) whether the average weekly trading volume was substantial, since such a showing implies and active and deep market for the stock, as well as investor interest in the company and in trading its stock, and therefore that

12

investors would discover new information and trade on it; (2) the number of analysts covering the company, since they disseminate information, analyses, and opinions; (3) the number of market makers, since they would quickly buy and sell stock when new news was released; (4) whether the company was eligible to file a registration statement on Form S-3, since this form presumes that an issuer's stock trades on an efficient market, and (5) whether there is a causal relationship between unexpected corporate events or financial releases and changes in the company's stock price. *Cammer*, 711 F. Supp. at 1285, 1286-87.

The next-most influential case added three factors that all touched on the stock's market's efficiency: (6) market capitalization, since according to that court there is greater incentive to invest in more highly capitalized companies; (7) bid-ask spread, since a low bid-ask spread makes a stock inexpensive to trade; and (8) size of the float, which is market capitalization minus insider holdings, since stocks with larger percentages of insider holdings may have nonpublic information that is not yet reflected in stock prices. *Krogman v. Sterritt*, 202 F.R.D. 467, 478 (N.D. Tex. 2001).

 1. *A plaintiff can show fraud-on-the-market either by showing that the security trades on an efficient market or by showing the misrepresentation had a price impact.*

The Supreme Court did not address the fraud-on-the-market theory directly until it decided *Halliburton II*.[7] *Halliburton II* reaffirmed that investors are entitled to a presumption of reliance if they show that the false statements were incorporated into the stock price. *Halliburton II*, 134 S. Ct. at 2411. *Halliburton II* also characterized the premise underlying the presumption of reliance as "fairly modest," and based on nothing more than that "market professionals generally consider most publicly announced material statements about companies, thereby affecting stock market prices." *Id.* at 2410.

*Halliburton II* clarified that the *ultimate* question is not whether the stock generally incorporates material news, but whether the *specific false statements* have been incorporated into the stock's price, i.e. had a price impact. This is because if the misrepresentation impacts (inflates) the stock's market price, and the plaintiff purchases the stock in the market at the time when the market price is affected (inflated) by the misrepresentation, the necessary connection between the misrepresentation and plaintiff's purchase is established. *Halliburton II* 134 S.Ct. at 2413-2415. The Court specifically held that a plaintiff may also prove that a false statement was incorporated into the stock price by showing that the stock traded on an efficient market. *Halliburton II*, 134 S. Ct. at 2415. The Court,

---

[7] In recent years, the Court has repeatedly addressed class certification in securities class actions. The Court has held that neither loss causation nor materiality should be assessed at class certification. *Halliburton I*, 131 S. Ct. at 2186; *Amgen Inc. v. Connecticut Ret. Plans & Trust Funds*, 133 S. Ct. 1184, 1191 (2013).

14

however, dubbed this evidence an "indirect proxy for price impact", and noted that a presumption of reliance may be granted if a party comes forward with sufficient direct evidence of price impact. *Id.* at 2415.  Though it held that a defendant could attempt to rebut the presumption with evidence of no price impact, the Court specifically noted that plaintiffs may also submit price impact evidence at class certification. *Id.* at 2415.

Experts commonly show price impact by showing either that the stock price increased after the misrepresentation or that it fell after the corrective disclosure. The Circuit opinion that *Halliburton II* reversed held:

> Price impact can be shown either by an increase in price following a fraudulent public statement or a decrease in price following a revelation of the fraud. To successfully prove a lack of price impact, Halliburton would thus be required to demonstrate both that the stock price did not increase when the misrepresentation was announced, and that the price did not decrease when the truth was revealed.

*Erica P. John Fund, Inc. v. Halliburton Co.*, 718 F.3d 423, 434 (5th Cir. 2013) *vacated and remanded,* 134 S. Ct. 2398 (U.S. 2014).[8]

Similarly, interpreting the loss causation element, the Eleventh Circuit has held that even though plaintiffs did not prove that the false statement caused the market price to increase at the time they were made, plaintiffs could still show the necessary causal connection between the misrepresentation and investors' losses by evidence that a corrective disclosure caused a decrease in the market price.

---

[8] While *Halliburton II* reversed the Fifth Circuit, had the Supreme Court interpreted the concept of price impact differently, it surely would have said so.

15

*FindWhat Investor Grp. v. FindWhat.com*, 658 F.3d 1282, 1314 (11th Cir. 2011). In short, the inflationary component of the fraud (i.e. price impact) may be proven by a statistically significant share price drop on disclosure of the fraud.

   2. *There is ample evidence both that MiMedx's stock traded on an efficient market and that Defendants' false statements had price impact.*

   The Eleventh Circuit recently confirmed that there is no "mandatory analytical framework" for analyzing market efficiency, and that the Eleventh Circuit provides "District Courts the flexibility to make the fact-intensive inquiry on a case-by-case basis.  Beyond that, the flexible approach will allow District Courts in the future to consider new factors yet unknown to this Court that market theorists might consider to indicate market efficiency." *Local 703 v. Regions Financial Corp.* 762 F.3d 1248, 1255 (11th Cir. Aug. 6, 2014).  In *Regions,* the Eleventh Circuit reiterated the features of market efficiency, such as high volume trading, but noted that "..[e]ven these general signs of an efficient market may not be required for a finding of an efficient market in every case.  Stocks that trade on a smaller scale, or that are not widely followed, might trade on an efficient market. It is up to the District courts to consider the nature of the market on a case-by-case basis to decide whether the totality of the circumstances supports a finding of market efficiency." *Id.*  Furthermore, as the Supreme Court stated in *Halliburton II* and the district court for the Southern District of Florida echoed, the presumption of reliance does not require perfect market efficiency because "in reality, [t]he

16

market for some securities are more efficient than the market for others, and even a single market can process different kinds of information more or less efficiently, depending on how widely the information is disseminated and how easily it is understood.'" *Arnaz v. Catalyst Pharm.*, 302, F.R.D. 657, 670 (S.D. Fla. 2014) (quoting *Halliburton II* at 2409-10).

Here, looking at the *Cammer* Factors and taking into account the Eleventh Circuit's totality of the circumstances approach to assessing market efficiency there is no doubt that MiMedx stock traded on an efficient market.   This conclusion is supported by the Expert Report of Dr. Paul Seguin. Dr. Seguin holds a Ph.D. in Business Administration and a Masters of Science in Applied Economics and has held academic appointments at Vanderbilt University and the University of Georgia, *inter alia*, where he specifically taught the subjects of event study methodology and market efficiency.  (Seguin Dec. ¶¶7, 9).

     *a.*  The *Cammer* Factors.

**Factor One: Average Weekly Trading Volume:** On average, 613,000 shares of MiMedx stock were traded daily during the Class Period. (Seguin Dec. ¶37). The average weekly trading volume for MiMedx's stock was about 4% of the outstanding shares during the Class Period. (*Id*). The *Cammer* court concluded that average weekly trading volume of 2% or more permits a very *strong* presumption of an efficient market. *Cammer*, 713 F.Supp. 1264, 1293. MiMedx's trading

17

volume was twice the *Cammer* threshold, indicating the market for its shares was efficient.

**Factor Two: Number of Securities Analysts Following the Stock:** At least three different securities analysts published numerous analyst reports on MiMedx during the Class Period. (Seguin Dec. ¶42). This analyst coverage tilts in favor of market efficiency. *In re Nature's Sunshine Prod.'s Inc. Sec. Litig.*, 251 F.R.D. 656, 663 (D. Utah 2008) (four analysts support market efficiency).

**Factor Three: Number of Market Makers:** There was sufficient market-maker interest in MiMedx common stock during the Class Period for the stock to trade efficiently. During the Class Period, there were at least 21 market makers for MiMedx common stock. (*Id.* at ¶46). For *Cammer*, ten market makers justified a substantial presumption that the market is efficient. *Cammer*, 711 F. Supp. 1264, 1293.

**Factor Four: Whether The company Was Entitled To File An S-3 Registration Statement:** During the Class Period, MiMedx was eligible to file and did an SEC registration statement on Form S-3. This further shows that the market for MiMedx stock was efficient. (*Id.* at ¶51).

**Factor Five: Evidence of A Cause And Effect Relationship Between Unexpected News And Changes In The Issuer's Stock-Price:** This factor is considered the most important of the *Cammer* factors. (*Id.* at ¶57). Dr. Seguin

18

performed multiple tests to determine the extent to which the arrival of information led to changes in the price of MiMedx stock.  (*Id*. at ¶58)).

The first test that Dr. Seguin performed involves looking at "autocorrelation," or whether it's possible to predict a stock's future returns based on it's past returns.  A finding of significant autocorrelation would mean that one could use a stock's past returns to generate a profitable trading strategy, leading to a finding of market inefficiency. (*Id.* at ¶¶59-60).  By contrast, if there is no correlation between past and future returns, a market is (weak form) efficient, because absent inside information it is impossible to come up with a "trading rule" that outperforms the market. (*Id*. at ¶62).  Dr. Seguin found that the so-called "first order autocorrelation" and the combined predictive power of the first through the fifth order autocorrelation were statistically and economically indistinguishable from zero.  He thus concluded that MiMedx's share price returns follow a random walk – supporting a finding of market efficiency. (*Id*. at ¶¶63-64).

Dr. Seguin next performed tests to determine whether, on average, MiMedx stock price changes were larger on days when news about the Company was released, as compared to days when no news about the Company was released. (*Id.* at ¶66).  Dr. Seguin looked at two sets of news days: the six days when there were analyst forecasts for MiMedx and the four days when MiMedx announced earnings. (*Id*.).  Dr. Seguin estimated regressions with MiMedx volumes or price volatilities against its market counterpart (the Russell 2000).  If information

19

released on these news days has an effect on price moves (absolute or unsigned) or unusually large volume, then the coefficient associated with news days should be statistically significant at a 95% confidence level. (*Id*. at ¶67). Dr. Seguin found that volume was 119% higher on the six analyst forecast event days as compared to the remaining days. These results were statistically significant beyond the 95% hurdle. (*Id*. at ¶70-71). Dr. Seguin also tested whether there were abnormally large price movements on news days. This test showed that new material information (analyst forecasts and earnings releases) was causing rapid changes in MiMedx's share price. These results were statistically significant "beyond the 5% hurdle with all but one significant beyond the 1% threshold". (*Id*. at ¶73). Taken together, these tests demonstrate that there are reliably large moves of volume and volatility on news days. (*Id*. at ¶74).

Dr. Seguin reexamined the relationship between pre-selected news days and the magnitude of price changes using a different test (an F-Test) that contrasts the volatility of returns on news days to those on non-news days. (*Id*. at ¶75). In an efficient market, prices should react quickly to news. (*Id*.). Dr. Seguin measured the magnitude of price moves by looking at their variance, i.e. the ratio of the (squared) returns during news days to those of non-news days. (*Id*.). Dr. Seguin found that the return variance on the four earnings days and across the ten news days is greater than the non-news days. (*Id*. at ¶79). Dr. Seguin's tests showed that volatilities associated with news days were between 3.9 to 5.5 times the volatilities

20

associated with no-news days – indicating that material news caused rapid changes in MiMedx's stock price. (*Id*). These results were statistically significant beyond the 99% confidence level.

The above tests are solid evidence of a cause and effect relationship between news and rapid changes in MiMedx's stock price and support a finding of market efficiency.

   *b.* The *Krogman* Factors

**Factor One: The Capitalization of the Company:** The average market capitalization during the Class Period was $628 million. (Seguin Report ¶82). MiMedx was larger than at least 57.8% of other NASDAQ-listed publicly traded companies in the United States during the Class Period. (*Id*. at ¶83).  This supports a finding of market efficiency. (*Id*).

**Factor Two: Stock's Float:** The average float of MiMedx stock during the Class Period was $502 million. (*Id*. at ¶85). (A stock's float is the number of shares outstanding that is available to the investing public for purchase or sale. (*Id*. at fn. 42). Its total market capitalization was $628 million. *(Id.* at *¶82)*. Thus, 80% of its outstanding shares were available for trading on the Nasdaq. MiMedx's high float percentage is indicative of the efficiency of the market for its stock. *Id.*

**Factor Three: The Bid-Ask Spread:** The bid-ask spread is a reflection of the underlying efficiency of the market for a stock because if a spread is wide then it may not be profitable to exploit small deviations in prices from the intrinsic

21

value of the stock since the gains, i.e., the differences between price and value, are less than the trading costs.  When some traders have information that others don't market makers set their spreads wide, but when all public information is broadly circulated spreads are narrow. (Seguin Report ¶86) The average Bid-Ask Spread of MiMedx stock was $0.052 (5.2 cents) (*Id*. at ¶87).   The relative spread, or the ratio of the width of the bid-ask spread to MiMedx's concurrent stock price averaged 0.8% over the Class Period. (*Id*. at ¶88). The Court in *Cyberguard* found that a bid-ask spread as wide as 3.4% supports a finding of market efficiency. (*Id*. at ¶89). The spreads associated with MiMedx stock are one third of that threshold. Accordingly, the narrow bid-ask spread supports a finding of market efficiency.

**Additional Evidence of Efficiency:** Dr. Seguin also opined that the following were additional factors supporting a finding of market efficiency: (a) MiMedx stock was traded on the NASDAQ National Market, (2) a significant number of financial institutions (70) purchased MiMedx stock and performed due diligence analyses on MiMedx during the Class Period,[9] and (3) there was substantial media coverage of MiMedx during the Class Period -161 news stories on 74 separate days or over 51% of the trading days. (*Id*. at ¶¶90-101).

    c.  *Price Impact.*

---

[9] A total of 84 institutions owned MiMedx stock during the Class Period. (*Id*. ¶98).

Plaintiff is independently entitled to a presumption of reliance if he shows that the alleged misrepresentations had an impact on MiMedx's stock price, as that is the ultimate fact underlying the presumption. *Halliburton II,* 134 S.Ct. at 2414-2416.

Dr. Seguin performed an event study of MiMedx's stock price reaction to material news, net of market effects, and concluded that the release of unexpected information concerning the Untitled Letter caused the price of MiMedx stock to fall by over one third. (Seguin Report at ¶111). Dr. Seguin found that when MiMedx announced receipt of the Untitled Letter on September 4, 2013 revealing that the FDA had stated that AmnioFix and EpiFix did not qualify for Section 361 exemption the stock price immediately fell that day by 36.7%. (*Id*. at ¶110). Dr. Seguin calculated that the magnitude of the stock price decrease that day, against the return he would have expected without MiMedx company-specific news, was statistically significant and thus concluded that the price of MiMedx stock that day decreased in response to MiMedx's disclosure. (*Id.* at ¶¶103-110).  The statistically significant share price decline upon disclosure that MiMedx's statements concerning its Section 361 exemption were false and misleading evidences that such misrepresentations had a direct impact on MiMedx's share price – inflating it 36.7%. (*Id.* at ¶110) Under *Halliburton II*, this showing entitles the Class to a presumption of reliance.

23

### 1. A Class Action Is Superior to Other Available Methods for Resolving This Controversy

Class action treatment is superior to other methods for the fair and efficient adjudication of this controversy.[10]  Securities actions such as this easily satisfy the superiority requirement of Rule 23.  Most violations of the federal securities laws, such as those alleged in the Complaint, inflict economic injury on large numbers of geographically dispersed persons to such an extent that pursuing individual litigation against well-financed, multiple adversaries is not feasible.  Under such circumstances, the alternatives to a class action are either no recourse for hundreds or thousands of stockholders who cannot afford to prosecute their claims, or a multiplicity of individual suits resulting in the inefficient administration of justice.  The class action provides a superior vehicle for resolution of the claims of members of the Class.  Courts have repeatedly recognized the general superiority of class treatment in securities actions involving large numbers of investors.  *See, e.g. In re Theragencis*, 205 F.R.D. at 697; *In re Miller Indus., Sec. Litig.*,  186 F.R.D. 680, 688 (N.D. Ga. 1999).  In addition, "separate actions by each of the class members would be repetitive, wasteful, and an extraordinary burden on the courts."  *Kirkpatrick*, 827 F.3d 725.

---

[10] Rule 23(b)(3) sets forth the following factors to be considered in making a "superiority" determination: (a) The interest of members of the class individually controlling the prosecution . . . of separate actions; (b) The extent and nature of any litigation concerning the controversy already commenced by . . . members of the class; (c) The desirability . . . of concentrating the litigation of the claims in a particular forum; and (d) The difficulties likely to be encountered in the management of a class action.

24

## 2. The Court Should Appoint Lead Counsel as Class Counsel

Rule 23(g) provides that "[u]nless a statute provides otherwise, a court that certifies a class must appoint class counsel." The Rosen Law Firm is qualified to act as Class counsel. Institutional Shareholder Services ranked the Rosen Law Firm number four in the nation for the number of securities class action settlements obtained in 2013.[11] Moreover, where "attorneys have been found to be adequate in the past, it is persuasive evidence that they will be adequate again." *Lutz v. Int'l Ass'n of Machinists and Aerospace Workers*, 196 F.R.D. 447, 453 (E.D. Va. 2000) (quoting *Gomes v. Illinois State Bd.*, 117 F.R.D. 394, 401 (N.D. Ill. 1987)). For the reasons previously stated herein, Plaintiff respectfully requests that The Rosen Law Firm, P.A. be appointed Class Counsel.

## IV.  CONCLUSION

For the foregoing reasons, Plaintiff respectfully requests entry of an order certifying this action as a class action, appointing Arnold Entz as class representative, and appointing The Rosen Law Firm, P.A. as class counsel.

---

[11] *Supra,* Note 6. *See also Vinh Nguyen v. Radient Pharm. Corp.*, SACV 11-00406 DOC, 2014 WL 1802293 (C.D. Cal. May 6, 2014) (The Rosen Law Firm "took on significant risk in this case, working thoroughly and enthusiastically through extensive litigation that required significant expert involvement"); *Bensley v. FalconStor Software, Inc.*, 277 F.R.D. 231, 242 (E.D.N.Y. 2011) ("the Rosen Law Firm is well-qualified to serve as lead counsel in this matter") (quoting *In re Fuwei Films Sec. Litig.*, 247 F.R.D. 432, 439 (S.D.N.Y. 2008)); *Skeway v. China Natural Gas, Inc.*, CV 10-728-RGA, 2014 WL 2795466, at *6, *8, and n.3 (D. Del. June 18, 2014) (noting the Rosen Law Firm are experienced in securities class actions).

Dated: March 16, 2015        Respectfully submitted,

**THE ROSEN LAW FIRM, P.A.**

By: /s/ Laurence Rosen
Laurence M. Rosen, Esq.
Phillip Kim, Esq.
Sara Fuks, Esq.
275 Madison Avenue, 34th Floor
New York, NY 10016
Phone: (212) 686-1060
Fax: (212) 202-3827
sfuks@rosenlegal.com
lrosen@rosenlegal.com
pkim@rosenlegal.com
sfuks@rosenlegal.com

Lead Counsel for Plaintiff

and

s/ Lauren S. Antonino, Esq.
Ga. Bar No. 652408
The Antonino Firm LLC
Five Concourse Parkway
Suite 1425
Atlanta, Georgia 30328
Tel: 770-408-1229
Fax: 866-372-5586
lauren@antoninofirm.com

Liaison Counsel for Plaintiff

26

## Local Rule 7.1D Certification

Counsel for Plaintiff hereby certifies that the foregoing Plaintiff's Motion for Class Certification and Appointment of Class Representative and Class Counsel has been prepared with Times New Roman 14 point font, one of the fonts and point selections approved by the Court in Local Rule 5.1C.

This 16th Day of March, 2015                    s/ Sara Fuks, Esq.

**CERTIFICATE OF SERVICE**

I, Sara E. Fuks, hereby certify that I electronically filed Plaintiff's Motion for Class Certification and Appointment of Class Representative and Class Counsel with the Court using the CM/ECF system, which will automatically send email notification of such filing to all attorney of record.

This 16th day of March, 2015                                   s/ Sara Fuks, Esq.